# EXHIBIT C



ENTERED AND
SERVED

NOV 13 1998

CLERK U.S. DISTRICT COURT
DISTRICT OF NEVADA

BY_____ DEPUTY

NOV 16 RECD

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

1

2

3

4

5

6

7  FORTUNET, INC., a Nevada        )
   Corporation                     )
8                                  )       CV-S-95-00008-PMP (LRL)
                   Plaintiff,      )
9                                  )
   v.                              )        O R D E R
10                                 )
   BINGO CARD MINDER CORP., a      )
11 Delaware Corporation, and       )
   STUART ENTERTAINMENT, INC., a   )
12 Delaware Corporation,           )
                                   )
13                 Defendants.     )
   _____)

14

15        Presently before the Court is Plaintiff Fortunet, Inc.'s

16 Amended Motion and Supporting Memorandum for Summary Judgment that

17 Stuart Entertainment, Inc. Infringes the '787 Patent (#218D) filed

18 on August 1, 1997.  Stuart Entertainment, Inc. ("Stuart") filed an

19 Opposition (#231) on August 8, 1997, referring the Court to

20 arguments made in its earlier Motion for Summary Judgment (#105)

21 and Reply (#121).  Fortunet filed a Reply (#303) on August 29,

22 1997.  On December 8, 1997, Fortunet filed an Addendum to its

23 Motion for Summary Judgment (#376).

24        Also before the Court is Stuart's Request for Limited

25 "Additional Relief" Per the September 23, 1998 Minutes of Court,

26 Including Submission of Additional Evidentiary Grounds for Partial

F02154

1  Summary Judgment of Noninfringement (#442) filed on October 13,

2  1998.  Fortunet filed its Opposition to Stuart Entertainment,

3  Inc.'s Request for "Additional Relief" per the September 23, 1998

4  Minutes of the Court; Motion to Strike (#449) on October 26, 1998.

5

6  **I.   Introduction**

7       Both Fortunet and Stuart seek summary judgment as to

8  whether Stuart's System 12 device infringes the '787 Patent.

9  Stuart argues that the System 12 does not contain several

10 limitations of the '787 Patent.  For the reasons stated below, the

11 Court finds that Stuart's System 12 does infringe claims 1, 5, and

12 7 of the '787 Patent.

13 **II.   Summary Judgment Standard**

14       Pursuant to Federal Rule of Civil Procedure 56, summary

15 judgment is proper "if the pleadings, depositions, answers to

16 interrogatories, and admissions on file, together with the

17 affidavits, if any, show that there is no genuine issue as to any

18 material fact and that the moving party is entitled to a judgment

19 as a matter of law." Fed. R. Civ. P. 56.  All facts and

20 inferences drawn must be viewed in the light most favorable to the

21 responding party when determining whether a genuine issue of

22 material fact exists for summary judgment purposes.  Brinson v.

23 Linda Rose Joint Venture, 53 F.3d 1044, 1050 (9th Cir. 1995).

24 After drawing inferences favorable to the respondent, summary

25 judgment will be granted only if all reasonable inferences defeat

26 the respondent's claims.  S.E.C. v. Seaboard Corp., 677 F.2d 1297,

F02155

1298 (9th Cir. 1982).

A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. See S.E.C. v. Seaboard Corp., 677 F.2d 1301, 1305-06 (9th Cir. 1982). The substantive law defines which facts are material. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A genuine issue of material fact is more than some "metaphysical doubt" as to the material facts. Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986). Only disputes over outcome determinative facts under the applicable substantive law will preclude the entry of summary judgment. Id. If the factual context makes the respondent's claim implausible, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The party moving for summary judgment has the initial burden of showing the absence of a genuine issue of material fact. Metro Indus., Inc. v. Sammi Corp., 82 F.3d 839, 847 (9th Cir.), cert. denied, 117 S. Ct. 181 (1996). Once the movant's burden is met by presenting evidence which, if uncontroverted, would entitle the movant to a directed verdict at trial, the burden then shifts to the respondent to set forth specific facts demonstrating that there is a genuine issue for trial. Liberty Lobby, 477 U.S. at 250. In meeting this burden, parties seeking to defeat summary judgment cannot stand on their pleadings once the movant has submitted affidavits or other similar materials. Affidavits that

F02156

1  do not affirmatively demonstrate personal knowledge are

2  insufficient. <u>Keenan v. Allan</u>, 91 F.3d 1275, 1278 (9th Cir. 1996).

3      The Supreme Court cases cited above establish that

4  "[s]ummary judgment procedure is properly regarded not as a

5  disfavored procedural shortcut, but rather as an integral part of

6  the Federal Rules as a whole, which are designed `to secure the

7  just, speedy and inexpensive determination of every action.'"

8  <u>Celotex Corp.</u>, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

9  **III.  Procedural History**

10      Fortunet filed this lawsuit on January 3, 1995, alleging

11  that electronic bingo devices owned, made, or sold by BCMC and

12  Stuart infringe its '025 Patent.  By Order (#39) dated July 26,

13  1995, this Court allowed Fortunet to amend its Complaint to add

14  allegations that Stuart's devices infringe the '462 Patent.  By

15  Order (#64) dated January 19, 1996, the Court again allowed

16  Fortunet to amend its Complaint, this time to add an allegation

17  that Stuart's System 12 infringes Fortunet's '787 Patent.  The

18  Court denied Fortunet's request to amend its Complaint a third

19  time to allege that BCMC's T.E.D. device infringed Fortunet's '025

20  Patent.  (Order #106, 3/14/97.)  Along with its Answer to

21  Fortunet's Complaint, BCMC filed a counterclaim asking the Court

22  to declare the '025 Patent invalid.  Stuart also filed a

23  counterclaim seeking declaratory relief that the '025, '462, and

24  '787 Patents are invalid.

25      On October 5, 1995, Stuart requested that the Patent and

26  Trademark Office ("PTO") reexamine the validity of the '025 Patent

F02157

FortuNet, Inc.

1  and the '462 Patent.  The PTO granted Stuart's request on December
2  13, 1995.  Stuart later requested that the PTO also reexamine the
3  validity of the '787 Patent.  Due to the reexamination
4  proceedings, the Court stayed proceedings in the instant case.
5  (Order #65, 1/19/96.)  The Court asked the parties to update the
6  Court of the PTO's progress during the reexamination proceedings
7  and informed the parties that the Court would lift the stay in the
8  event of undue delay caused by the reexamination proceedings.
9  During the next year, the PTO made progress in its reexamination
10 of the various patents, but did not finally decide the issue of
11 the patents' validity.  Therefore, the Court lifted the stay by
12 Order (#77) dated January 28, 1997.

13      During the reexamination proceedings, the PTO determined
14 that some of the '025 Patent's claims were invalid and allowed
15 some new claims, recertified the '462 Patent, and initially
16 rejected, but later recertified the claims of the '787 Patent.
17 Fortunet appealed the PTO's decision as to the '025 Patent.  In an
18 Opinion mailed on September 16, 1998, the Board of Patent Appeals
19 and Interferences reversed the examiner's final rejection of some
20 of the claims of the '025 Patent, but then entered new grounds for
21 rejection.  Following the Board's decision, the Court severed and
22 stayed the action related to the '025 Patent. (Order #447A,
23 10/22/98.)

24      Shortly after the Court lifted the original stay, Stuart
25 filed a Motion for Partial Summary Judgment that the '787 Patent
26 Is Not Infringed by the System 12, Which Does Not Include "At

F02158

1  Least Two Different Distinct and Independent Games." The Court
2  denied the Motion. (Order #256, 8/8/97.) In addition, Fortunet
3  filed the instant Motion for Summary Judgment that Stuart
4  infringes the '787 Patent. The Court subsequently entered its
5  Order Re: Claim Construction. (Order #426, 4/13/98.) On
6  November 5, 1998, the Court issued an Order (#451) reconsidering
7  and clarifying its previous claim construction Order.

8  **IV.  Factual Background**

9      For the purposes of the current motions for summary
10 judgment, Stuart does not dispute any of the following facts.
11 Fortunet manufactures electronic bingo devices and owns several
12 patents covering electronic bingo technology. The PTO issued
13 Fortunet's '787 Patent on August 15, 1989. Fortunet maintains
14 that Stuart's System 12 device infringes the '787 Patent.

15     **A.  '787 Patent**

16     The '787 Patent describes an electronic device for
17 concurrent play of multiple games like bingo, keno, poker,
18 blackjack, roulette, slots, gin, and sportsbook on one terminal.
19 The patent describes a distributed game network consisting of
20 master computers and slave computers. The master computer sends
21 commands and random game data to the slave computers, and the
22 slave computers send back the status of the games and accounting
23 information.

24     The master computer has a keyboard, hard disk, display,
25 and printer. The slave computer is a smart terminal with a
26 microprocessor. The slave device also has a touch screen display

F02159

FortuNet, Inc.

1  that shows the games, the status of the games, and accounting

2  information.   The patent also describes a smart card that is used

3  in conjunction with the slave computers.   The smart card contains

4  its own microprocessor and keeps track of a player's bets and

5  stores bingo card contents.   An electronic card reader and writer

6  can be used to interface with the smart card.

7       In addition to individual play, the patent describes games

8  where the players pool their resources and play together or where

9  the players play against each other.   The preferred embodiment of

10  the patent points out that the game network can include games

11  other than bingo, keno, poker, and blackjack.

12       Claim 1 of the '787 Patent is representative and provides

13  as follows:

14       Game network comprising at least one master game
        device interconnected with at least one slave game
15       device; said slave game device executing
        concurrently at least two different distinct and
16       independent games; each of said different distinct
        and independent games comprising its own unique
17       rules of play and unique random factors; said
        different distinct and independent games including
18       bingo, keno, poker, blackjack, roulette, slots, gin
        and sports book; said master game device providing
19       data for playing said games; and at least one of
        said two different distinct and independent games
20       being at least partially responsive to said data
        from said master game device.

21

22  B.  System 12

23       The System 12 is a computer network with a central

24  computer and player terminals.   The central computer stores sets

25  of pre-defined bingo cards called permutations or perms.   These

26  cards were created from the Bingo King line of paper bingo cards.

F02160

1  The player purchases the cards, and the central computer downloads
2  the cards and the bingo patterns onto the player computer.  A
3  player can also play paper bingo cards at the same time the player
4  is using the System 12 computers.  To avoid simultaneous winners
5  with the same cards, Stuart attempts to ship a different set of
6  cards for a bingo hall's computer system and for the hall's paper
7  system.

8      A conventional blower generates the called bingo numbers.
9  The caller then inputs the numbers into the central computer, and
10  the central computer automatically transmits the numbers to the
11  players' computers.  The System 12 can operate in manual, semi-
12  automatic, and fully automatic modes.  In the manual mode, the
13  player must daub any called numbers that match the numbers on the
14  cards.  In the semi-automatic mode, the computer highlights the
15  matches.  In the fully automatic mode, the computer automatically
16  daubs any matches.

17      The player terminals display the bingo cards in a video,
18  touch screen format.  Therefore, if the player is doing his or her
19  own daubing, the player touches the square containing the bingo
20  number that matches the called number.  The screen displays the
21  best card or cards, but the player can play numerous cards at
22  once.  The bingo numbers on the bingo card are verified through
23  the use of a serial number appearing on the center of the
24  displayed card.  The serial number matches the serial numbers used
25  on Stuart's paper bingo cards.

26

F02161

FortuNet, Inc.

1    When allowed by law, the System 12 can also provide the

2  player the option of playing several different games including

3  bingo, bonanza bingo, video poker, keno, pulltabs, and slots.  The

4  device will keep track of a player's bingo numbers while the

5  player plays another game.  For example, the player can exit a

6  bingo game and start playing video poker.  After playing poker,

7  the player can go back to the bingo game, and, if it is in the

8  automatic mode, the System 12 will have marked all the matches.

9  **V.  General Patent Infringement Law**

10    A patent is infringed when a party "without authority

11  makes, uses, offers to sell, or sells any patented invention,

12  within the United States or imports into the United States any

13  patented invention during the term of the patent . . ."  35

14  U.S.C.A. § 271(a) (West 1998).  A court finds that a party

15  infringes a patent when the patent claim "'covers the alleged

16  infringer's product or process.'"  Markman v. Westview Instruments,

17  Inc., 517 U.S. 370, 374 (1996) (quoting Herbert F. Schwartz,

18  Patent Law and Practice 80 (2d ed. 1995)).  A party can infringe a

19  patent literally or through the doctrine of the equivalents.  See

20  Herbert F. Schwartz, Patent Law and Practice 81-84 (2d ed. 1995).

21    A court's literal infringement analysis involves two

22  steps.  First, the court construes the claims of the patent at

23  issue.  Victronics Corp. v. Conceptronic, Inc., 90 F.3d 1576,

24  1581-82 (Fed. Cir. 1996).  The second step is a question of fact.

25  General Mills, Inc. v. Hunt-Wesson, Inc., 103 F.3d 978, 981 (Fed.

26  Cir. 1997).  Either a jury or a court determines whether the

F02162

1    alleged infringing product infringes the construed claim.

2    Victronics Corp., 90 F.3d at 1582.  This Court completed step one

3    in its Order Re: Claim Construction (#426) and in its Order

4    reconsidering the claim construction (#451).

5         In order to find that the accused product infringes the

6    patent, the jury, or the court if there are no issues of material

7    fact, must find that "every limitation of the patent claim [is]

8    found in the accused infringing device."  Id.  For literal

9    infringement of means-plus-function elements, the jury or court

10   must decide if the accused device performs the same function as

11   the function recited in the means-plus-function element.  Mas-

12   Hamilton Group v. LaGard, Inc.,156 F.3d 1206, 1211-12 (Fed. Cir.

13   1998).  "If the identical function is performed, the fact-finder

14   must then determine whether the accused device utilizes the same

15   structure or materials as described in the specification, or their

16   equivalents."  Id. at 1212.

17        If the accused device does not have all of the limitations

18   of the patent claim, a court can still find infringement through

19   the doctrine of the equivalents when the infringer "steals the

20   heart of an invention, but avoids the literal language of the

21   claim by making a noncritical change."  Schwartz, supra, at 82;

22   see also Valmont Indus., Inc. v. Reinke Mfg. Co., 983 F.2d 1039,

23   1043 (Fed. Cir. 1993).  According to the Supreme Court, the

24   central question is whether "the accused product or process

25   contain[s] elements identical or equivalent to each claimed

26   element of the patented invention."  Warner-Jenkinson Co. v.

F02163

1  <u>Hilton Davis Chemical Co.</u>, 117 S. Ct. 1040, 1054 (1997).  In order

2  to answer that question courts often ask whether "a component in

3  the accused subject matter performs substantially the same

4  function as the claimed limitation in substantially the same way

5  to achieve substantially the same result."  <u>Ethicon Endo-Surgery,</u>

6  <u>Inc. v. United States Surgical Corp.</u>, 149 F.3d 1309, 1315 (Fed.

7  Cir. 1998).

8       A court must keep in mind two major limitations on the

9  doctrine of equivalents analysis.  First, different inventions are

10  accorded a different range of equivalents.  Schwartz, <u>supra</u>, at

11  83; <u>Nelson v. Batson</u>, 322 F.2d 132, 135 (9th Cir. 1963).  For

12  example, a court must give a pioneering invention a broader range

13  of equivalents than an invention that contains only a minor

14  innovations.  <u>Hughes Aircraft Co. v. United States</u>, 717 F.2d 1351,

15  1362 (Fed. Cir. 1983).  Second, a patent owner is estopped from

16  benefitting from the doctrine of the equivalents if the owner gave

17  up a potential equivalent during patent prosecution to obtain the

18  patent.  <u>Maxwell v. J. Baker, Inc.</u>, 86 F.3d 1098, 1107 (Fed. Cir.

19  1996), <u>cert. denied</u> 17 S. Ct. 1244 (1997).  This is known as

20  prosecution history estoppel.  Schwartz, <u>supra</u>, at 83.

21

22  **VI.  Discussion**

23       As discussed in this Court's Order concerning infringement

24  of the '462 Patent, the Court will treat Stuart's Request for

25  Limited "Additional Relief" as a motion for summary judgment of

26  noninfringement.  The System 12 must have every limitation of the

F02164

1  '787 patent for the Court to find that it infringes the patent.

2  Stuart does not dispute that the System 12 contains some of the

3  limitations of the '787 Patent, and the Court will not discuss the

4  elements that Stuart does not dispute. For convenience, the Court

5  will use the same letters as used by Fortunet in its Motion for

6  Summary Judgment to refer to the disputed elements of the '787

7  Patent.

8      A.  Claim 1, Element (BBB)

9      Element (BBB) contains the following limitation: "said

10  slave game device executing concurrently at least two different

11  distinct and independent games."  This element requires that the

12  device play two games at once.  It allows the device to operate

13  one of the games automatically, without human interaction, where

14  the automatic game is not seen on the screen.  (Order #426, p. 33-

15  34.)

16      The System 12 allows a player to play several games like

17  video poker, while it keeps track of the called bingo numbers in a

18  bingo game.  The System 12 does not display the bingo game.

19  Fortunet argues, and the Court agrees, that the System 12 thus

20  contains the limitation of element (BBB) that the device plays two

21  games concurrently because human interaction with both games is

22  not required.[1]

23  ───────────────────────

24      [1]  Stuart argues that a statement made by Fortunet during
reexamination demonstrates that the '787 Patent requires that the

25  device visually display both games.  This Court has already found
that visual display is not required, and Stuart should have raised

26  this argument during claim construction.  Additionally, the statement
made by Fortunet does not show that the '787 Patent requires visual

B.  Claim 1, Element (CCC)

   According to element (CCC) an infringing device must contain the following limitation: "each of said different distinct and independent games comprising its own unique rules of play and unique random factors."  This limitation means that the games played concurrently by the device must have some difference in both the rules of play and the random factors.  (Order #426 pp. 34-35.)  "[A] game with different rules of play and nonunique random factors would not be covered by the language of the claim." (Order #426, p. 35.)

   Stuart argues that the System 12 does not contain the limitation of this element.  Two of the games concurrently played by the System 12 include regular bingo and bonanza bingo. Apparently conceding that bonanza bingo and regular bingo have unique rules of play, Stuart claims that bingo and bonanza bingo have the same random factors.[2]  As the Court understands bonanza

----

display.  While arguing to overcome a prior art reference, Fortunet explained that the prior art did not allow concurrent game playing and added that multi-game playing was impossible because the device could only display one game at a time.  (Response to Initial Office Action at 3-5.) Fortunet was noting one reason why the device in question did not allow concurrent game playing.  Fortunet did not say that such display is required.

   [2]   Stuart originally argued that the System 12 did not contain the limitation of element (CCC) because it did not concurrently execute bingo and bonanza bingo.  (Stuart's Reply Concerning its Mot. Part. Summ. J., #121, p. 4.)  Stuart made this argument because in some jurisdictions, the System 12 only played bingo and bonanza bingo.  However, the device has the capability to allow concurrent play of other games, like video poker.  Therefore, the System 12 could still infringe even if it did not concurrently play bingo and

1  bingo, the player purchases bingo cards at the beginning of a

2  bingo session.  Next, the caller or the device calls several

3  random bingo numbers and matches between the numbers on the card

4  and the called numbers are marked.  At this point, a regular bingo

5  session begins.  While the regular bingo session is going on, a

6  player can swap his or her originally purchased bonanza bingo

7  cards for new cards.  The numbers on the new cards are then

8  matched with the previously called numbers.  The player can

9  continue to swap cards until the end of the regular bingo session.

10  At the end of the regular bingo session, the caller or device

11  calls the remainder of the random bingo numbers for bonanza bingo

12  until there is a winner.

13       Stuart argues that bingo and bonanza bingo have the same

14  random factors because they use the same ball blowers.  However,

15  Stuart also acknowledges that some bingo halls use different

16  physical balls blowers for bonanza and regular bingo.  Regardless

17  of whether a bingo hall uses the same ball blower, bonanza bingo

18  and regular bingo have different random factors because bonanza

19  bingo allows the player to swap bingo cards.  The swapping of

20  bingo cards in bonanza bingo introduces a random factor not

21  present in regular bingo.  A player has a random chance to

22  _____

23  bonanza bingo.  Claim 1 of the '787 Patent is an open claim, and the
   accused device infringes as long as it contains the limitations of
24  the claim, even if it has additional elements.  See Peter D.
   Rosenberg, Patent Law Fundamentals § 14.05(2) (rev. ed. 1998).
25  Stuart now apparently concedes that the System 12 plays bonanza bingo
   and regular bingo at the same time as it does not argue the point in
26  its Request for Limited "Additional Relief."  (#443.)

14    F02167

1  increase his or her chance of winning in the middle of the game

2  that is not present in regular bingo.  Since bonanza bingo has

3  different random factors than regular bingo, the System 12

4  contains the limitation of this element.

5       C.  Claim 1, Element (DDD)

6           Element (DDD) provides the following limitation: "said

7  different distinct and independent games including bingo, keno,

8  poker, blackjack, roulette, slots, gin and sports book."  In its

9  Order Re: Claim Construction, the Court previously found that this

10  limitation means that the device must include all of the games

11  listed, but could include additional games, in order to infringe.

12  (Order #426, p. 35.)  However, after reconsidering the

13  construction of this claim, the Court determined that the list of

14  games provides examples of the kinds of games covered.  (Order

15  #451.)  Stuart argues that the System 12 does not have the

16  limitation of this element because the System 12 only allows a

17  player to play bingo, bonanza bingo, video poker, keno, pulltabs,

18  and slots.  It does not allow a player to play blackjack,

19  roulette, gin, or sports book.  Since the Court has determined

20  that the device does not have to play all the games, the System 12

21  does contain this limitation.

22       D.  Claim 5

23           Claim 5 is "[t]he combination of claim 1, wherein said

24  slave game device displays matches between data being transmitted

25  by said master game device and the contents of at least one game

26  card for playing at least one of said two different distinct and

1   independent games." In the Order Re: Claim construction, the

2   Court found that this claim contains all the limitations of Claim

3   1 and adds that the slave game device must show which data

4   received from the master game device coincides with the data on

5   one or more game cards of the slave game device. (Order #426, p.

6   36.) Fortunet argues that the System 12 infringes this claim

7   because the System 12 slave device highlights or marks matches

8   when played in the semi-automatic or automatic modes. The Court

9   agrees that the System 12 infringes this claim because it

10  infringes all the limitations of claim 1 and because Stuart does

11  not dispute that it marks matches.

12          E.  Claim 7

13          Claim 7 is "[t]he combination of claim 1, wherein two or

14  more of said slave game devices participate in a common game."

15  The Court earlier found that this claim contains all the

16  limitations of claim 1 and adds the limitation that the device

17  allow at least two players to participate in the same game.

18  (Order #426 p. 36-37.) Fortunet quotes language from the System

19  12 user manual to show that the System 12 allows the players to

20  participate in a common game of live bingo. Stuart does not

21  dispute this fact, and the System 12 infringes claim 1.

22  Therefore, the System 12 infringes this claim.

23

24

25

26

F02169

## VII.    Conclusion

Stuart argues that the System 12 does not contain several limitations of the '787 Patent.  The Court finds that the System 12 does allow concurrent play of two games, that bonanza and regular bingo have unique random factors, and that the '787 Patent does not require an infringing device to play all games listed in the patent.  Therefore, the Court finds that the System 12 infringes independent claim 1 of the '787 Patent.  The Court also finds that the System 12 infringes dependent claims 5 and 7.

IT IS THEREFORE ORDERED that Plaintiff Fortunet, Inc.'s Amended Motion and Supporting Memorandum for Summary Judgment that Stuart Entertainment, Inc. Infringes the '787 Patent (#218D) is GRANTED.

IT IS FURTHER ORDERED that Stuart's Request for Limited "Additional Relief" Per the September 23, 1998 Minutes of Court, Including Submission of Additional Evidentiary Grounds for Partial Summary Judgment of Noninfringement (#442) is DENIED IN PART. The Court DENIES Summary Judgment of Noninfringement of the '787 Patent.

DATED:  November 12, 1998

PHILIP M. PRO
United States District Judge

F02170

FortuNet, Inc.

# EXHIBIT D

# Settlement and License Agreement

This Settlement and License Agreement made this 25 day of July, 2002, by and between Fortunet, Inc., a Nevada corporation with an address of 2620 Highland Dr., Las Vegas, Nevada, USA 89109 ("Fortunet") and BK Entertainment, Inc., f/k/a Stuart Entertainment, Inc., a Delaware corporation and its subsidiaries, with an address of 301 Louth Street, St. Catharines, Ontario, Canada L2S 3V6 (collectively "BK").

## Background

A. Fortunet filed suit against BK in the United States Federal District Court for the District of Nevada, on January 3, 1995 ("Patent Suit"). Fortunet alleged, inter alia, that BK marketed an allegedly infringing product of a third party, Bingo Card Minder Corp., also a defendant in the Patent Suit, that infringed Fortunet's U.S. Patent Number 4,445,025 ("025 Patent").

B. Fortunet also alleged in the Patent Suit that certain products manufactured and sold by BK infringed Fortunet's '025 patent, its US Patent Number 4,624,462 ("'462 Patent") and its U.S. Patent Number 4,856,787 ("'787 Patent") (collectively, the "Fortunet Patents")

C. BK filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware on August 13, 1999. Fortunet timely filed a claim for damages relating to the suit described in paragraphs A & B above.

D. BK's First Amended Plan of Reorganization ("Delaware Plan") was confirmed by the order of the Court on December 14, 1999. In accordance with the Bankruptcy Court's order, Fortunet was permanently enjoined from pursuing its claims against BK in the Nevada action, or in any forum outside the Bankruptcy Court. For some months after the Court's order, the parties have been engaged in settlement discussions to fully and finally resolve all of Fortunet's claims against BK in all forums.

E. BK filed a petition for relief under Chapter 11 of the Bankruptcy Code on February 16, 2001 in the United States Bankruptcy Court for the District of Minnesota. On April 30, 2002, BK filed a proposed joint plan of reorganization and disclosure statement. The Bankruptcy Court has approved an amended disclosure statement and amended plan, and a confirmation hearing on the amended plan is set for July 26, 2002.

F. Fortunet had previously used BK's bingo permutations pursuant to written consents from BK. Such consents have terminated in accordance with their terms.

1

G. Fortunet is willing to sell to BK and BK will purchase from Fortunet on the terms and conditions herein a non-exclusive license of Fortunet's Patents herein, and to release its claim for past infringement on the terms and conditions herein.

H. BK is willing to release Fortunet from any claim it may have for the use of the permutations and BK further is willing to provide a non-assignable non-exclusive, fully paid-up license to use the permutations listed on Schedule A hereof on the terms and conditions herein.

NOW THERFORE, the parties, intending to be legally bound, agree as follows:

1. The Recitals above are incorporated by reference as though fully recited herein and form a part of this Agreement.

2. This Agreement and all provisions contained herein shall not be effective until this Agreement is approved by the entry of an order of the bankruptcy court having jurisdiction over BK's Chapter 11 bankruptcy case (the "Bankruptcy Court") Upon entry of the order ("the "Effective Date"), Fortunet shall dismiss without prejudice, the Patent Suit and withdraw with prejudice its proofs of claim filed in the Bankruptcy Case.

3. In the event that the Effective Date does not occur on or before August 1, 2002, this Agreement shall be null and void, unless the time for obtaining such court approvals is extended by the mutual written agreement of the parties.

4. Upon the Effective Date, BK fully, forever and irrevocably releases and discharges Fortunet, its parents, subsidiaries, associated or affiliated companies ("Affiliates") from any and all actions, causes of action, suits, debt, demands and claims by BK for all costs, damages, actions, causes of action or expenses (including attorney's fees) whatsoever, arising out of or relating to any and all uses of any bingo permutation of BK used by Fortunet without the unexpired, express written consent of BK, where such use occurred prior to the Effective Date.

5. Except as provided in paragraph 16, upon the Effective Date, BK grants to Fortunet a non-exclusive, non-transferable fully paid up license to use within the United States and Canada the permutations developed or created by BK that are listed on Schedule A attached hereto and incorporated by reference herein ("Permutations"). This license shall permit Fortunet to use the Permutations only in Fortunet's electronic bingo devices. Fortunet shall not be permitted to print any other form of playable bingo cards under this license.

6. Except as provided in paragraph 16, and upon the Effective Date and subject to the payments pursuant to paragraphs 9 and 10 of this Agreement, Fortunet fully, forever and irrevocably releases and discharges BK from any and all actions, causes of action, suits, debt, demands, and all claims by Fortunet and its Affiliates for all costs, damages, actions, causes of actions and expenses (including attorney's fees) whatsoever relating to BK's actual or alleged infringement of the '025 Patent, the

2

'462 Patent and the '787 Patent, whether individually, jointly or collectively, and any legally protectable technology or proprietary information relating thereto, where such actual or alleged infringement occurred prior to the Effective Date.

7. Upon the Effective Date and subject to payment of the royalty in paragraph 9 and 10, Fortunet grants to BK a non-exclusive license to make, use and sell those electrically powered devices intended for use in a bingo game, whether used by the game operator or player ("Electronic Bingo Products") that utilize or otherwise incorporate the licensed subject matter of the Fortunet Patents in the United States and Canada, including any reissues, continuations or extensions thereof.  This license is non-transferrable except as provided in paragraph 22.

8. In full and final consideration of the release and license granted to Fortunet herein, Fortunet agrees to pay BK the sum of $125,000 USD payable in twelve monthly installments of $10,416.67 commencing on 15th day of the first full month after the Effective Date and on the 15th day of each of the succeeding eleven months.

9. In full and final consideration of the release granted herein and its claim for damages for infringement of the Fortunet Patents,, BK agrees to pay to Fortunet the sum of $1,250,000 USD payable as follows:

   (a)    $1,000,000 of such sum shall be and hereby is waived by Fortunet on the Effective Date;

   (b)    $220,000 payable in eleven monthly installments of $20,000 commencing on the 15th day of the first full month after the Effective Date and on the 15th day of each of the succeeding ten months, and

   (b)    $30,000 payable on or before the 15th day of the twelfth full month after the Effective Date.

10. The payments in paragraphs 8 and 9 hereinabove shall be made in the following manner:  In preparing the BK monthly payment, BK shall credit to Fortunet each monthly payment owed by Fortunet according to paragraph 8 above by first deducting from the total BK monthly payment required pursuant to paragraph 9(a) the amount of the corresponding monthly payment of Fortunet set forth in paragraph 8.  In the event a credit remains to the benefit of Fortunet, such remaining amount shall be deducted in the same manner from BK's final payment described in paragraph 9(b).

11. As and for additional license fees, BK shall pay to Fortunet the sum of $13 for each electrically powered device intended for use by a bingo player ("Electronic Bingo Player Device") manufactured and placed into active use by BK from and after the Effective Date and until the expiration of the last of the Fortunet Patents; provided, however, that BK's total obligation under this Agreement shall in no event exceed $375,000 USD.  When payments totaling $375,000 USD have been made, the license granted herein shall be deemed to be fully paid and BK shall have no further payment

3

obligation for the license. The parties acknowledge that the scope of the license granted on Electronic Bingo Devices is broader than those Electronic Bingo Player Devices used to measure the amount of the royalty due hereunder and includes electrically powered devices used by the operator as well. BK shall report its manufacture and placement of Electronic Bingo Player Devices no later than 30 days after the close of the quarter in which manufacture and placement occurred. Replacements for Electronic Bingo Player Devices currently placed in the field as of the Effective Date shall not be subject to the royalty in this paragraph 11, but shall be reported by BK. At the time of delivery of such report, BK shall pay to Fortunet for the royalty calculated in accordance with this paragraph for the units manufactured and placed during that quarter. This license is non-transferrable except as provided in paragraph 22.

12. In the event BK or Fortunet fails to make any payment required when due, then the non-defaulting party may, on written notice, either (a) demand payment of the defaulting party, and if payment is not made within fifteen days of such demand, then the non-defaulting party may terminate the license granted herein, or (b) the non-defaulting party pursue any other remedy provided under this agreement or otherwise, including, but not limited to, being excused from making any required payment hereunder to the defaulting party.

13. The term of this Agreement shall continue until (a) the expiration of the last of the Fortunet Patents, or (b) termination by the mutual written consent of the parties, or (c) by the occurrence of an unremedied event of default as set forth in paragraph 15 hereof.

14. In the event that BK learns of any actual, potential or alleged infringement of any of the then unexpired Fortunet Patents licensed hereunder, BK shall promptly notify Fortunet. Fortunet shall have the sole right to bring an infringement action or similar proceedings hereunder. If requested to do so by Fortunet, BK shall cooperate with Fortunet in such action, provided Fortunet shall reimburse BK for any reasonable out-of-pocket expense in rendering such assistance and co-operation.

15. Notwithstanding any provision contrary hereto, the following shall be an event of default hereunder ("Event of Default"):

(a) If either party fails to perform any of its material obligations under this Agreement, and such failure is not cured within thirty (30) days after notice thereof by the other party, or if a representation or a warranty made by either party under this Agreement hereof proves to be incorrect or untrue at the time it was made or at any time during the term of this Agreement or any renewal thereof;

(b) If either party does not, at any time during the term of this Agreement, possess all rights necessary to carry out their respective obligations under this Agreement; and

4

     (c) If either party fails to make any payment due under the terms of this Agreement, and such failure continues for a period of fifteen days after notice from the other party of such failure.

16. Upon the occurrence of an Event of Default, the rights licensed herein shall cease and terminate. Upon the occurrence of an Event of Default with respect to paragraph 9 and 10 of this Agreement, the releases of paragraph 4 and 6 shall be void and of no force and effect and the parties shall be restored to their respective claims, defenses and affirmative defenses as if such releases had not been given.

17. Each party represents to the other party that:

     (a) it is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation;

     (b) it has full corporate power and authority to execute and deliver this Agreement and to perform the obligations hereunder;

     (c) the execution and delivery by it and the signatories of this Agreement, and the performance by it of its obligations hereunder, have been duly authorized by all requisite corporate action on the part of it, and no other corporate proceedings on the part of it are required in connection with the execution, delivery and performance by it of this Agreement; and

     (d) this Agreement, upon satisfaction of the conditions precedent to this Agreement, constitutes a valid and legally binding obligation of it, enforceable against it in accordance with its terms, subject to bankruptcy, insolvency, reorganization, moratorium and similar laws of general applicability relating to or affecting creditor's rights and general equity principles.

18. All notices or other communications hereunder shall be deemed to have been duly given and made if in writing and if served by personal delivery upon the party to whom it is intended, or by overnight courier service with evidence of receipt, to the address set forth below, or such other address as may be designated in writing hereafter, in the same manner, by such person:

    If to Fortunet:
        Fortunet, Inc.
        2620 Highland Dr.
        Las Vegas, Nevada USA 89109
        Attn: President


    If to BK:
        BK Entertainment, Inc.

300 Louth Street
St. Catharines, Ontario, Canada  L2S 3V6
Attn:  President
With a copy to:  Legal Department

19. Notwithstanding any other provision herein, this Agreement shall not be effective and binding on either party until the Effective Date.  BK has filed a motion with the Bankruptcy Court seeking approval of this Agreement and this Agreement will be approved by such court once it is fully signed and filed with such court.  The Effective Date shall be the date of the entry on the docket of the order of the Bankruptcy Court approving the terms of this Agreement and authorizing BK to enter into it.

20. Any provision of this Agreement may be amended or waived if, and only if, such amendment is in writing and signed, in the case of an amendment by both parties, or in the case of a waiver, by the party against whom the waiver is to be effective.  No failure or delay by any party in exercising any right power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege.

21. This Agreement and the agreements expressly referred to herein contain the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral and written, with respect to such matters.

22. This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their respective successors and permitted assigns only under the following circumstances.  Fortunet and BK agree that, notwithstanding any other provision herein, the rights and obligations of BK under this Agreement may be assumed and assigned pursuant to (a) a plan of reorganization confirmed by the Bankruptcy Court in the cases of *BK Entertainment, et al., Civ. Nos. 01-40638 – 01-40641*; (b) a sale of all or substantially all of the assets BK in bulk pursuant to 11 U.S.C. § 363 in the aforementioned cases; provided however, that (i) Fortunet has consented to such assignment (which consent shall not be unreasonably withheld) or (ii) Fortunet receives at the time of such assignment $1,000,000 in addition to any remaining amounts due Fortunet under this Agreement; or (c) the consent of Fortunet, which consent shall not be unreasonably withheld.  Nothing in this Agreement is intended to confer upon any person, other than the parties and their respective successors and permitted assigns, any rights or remedies under or by reason of this Agreement.

23. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or unenforceability of the other provisions hereof.  If any provision of this Agreement, or the application thereof to any person or entity or any circumstance, is invalid or unenforceable (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so

5

far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other persons, entities or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof in any other jurisdiction.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound have executed this Settlement and License Agreement on the day and year first above written.

Dated: _July 17, 2002_

Fortunet, Inc., on behalf of itself and its affiliates

By _____

Its: _PRESIDENT_

Dated: _July 25, 2002_

BK Entertainment, Inc., on behalf of itself and its affiliates

By _____

Its _____ _CFO_

#2580467\8

## SCHEDULE A

### LIST OF BK PERMUTATIONS TO BE LICENSED TO FORTUNET

| Perm Name | Product Name |
|---|---|
| Action | Action Line |
| BonusLine | Bonus Line |
| Champion | American Games B-Line 24 on |
| Champion | American Games B-Line 36 on |
| Champion | Champion |
| Champion | Champion 30 on |
| Champion | Kings Line 24 on |
| Champion | PreCall Bonanza |
| Chicago | Chicago |
| ClubLine | Club Line |
| Double_Action | Double Action |
| Elite | Elite |
| Giant | Giant Number |
| Mark 75 | Mark 75 |
| Mark 75 | Perfect Paper 24 on |
| Mark 75 | Perfect Paper 30 on |
| Mark 75 | Perfect Paper 36 on |
| Mini 75 | Mini 75 |
| OddEven | Odd Even |

# EXHIBIT E



# State of Delaware
## The Official Website for the First State



Visit the Governor | General Assembly | Courts | Other Elected Officials | Federal, State & Local Sites

State Directory | Help | Search Delaware :  (GO)     Citizen Services | Business Services | Visitor Info

**Department of State: Division of Corporations**

---

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws Online
Name Reservation
General Information
Status

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and Fees
UCC Searches
Taxes
Expedited Services
Service of Process
Registered Agents
Get Corporate Status
Submitting a Request

Frequently Asked Questions   View Search Results

## Entity Details

### THIS IS NOT A STATEMENT OF GOOD STANDING

| | | | |
|---|---|---|---|
| File Number: | **2106078** | Incorporation Date / Formation Date: | **10/31/1986** (mm/dd/yyyy) |
| Entity Name: | **BK ENTERTAINMENT, INC.** | | |
| Entity Kind: | **CORPORATION** | Entity Type: | **GENERAL** |
| Residency: | **DOMESTIC** | State: | **DE** |

### REGISTERED AGENT INFORMATION

| | | | |
|---|---|---|---|
| Name: | **CORPORATION SERVICE COMPANY** | | |
| Address: | **2711 CENTERVILLE ROAD SUITE 400** | | |
| City: | **WILMINGTON** | County: | **NEW CASTLE** |
| State: | **DE** | Postal Code: | **19808** |
| Phone: | **(302)636-5401** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ◯ Status  ◯ Status,Tax & History Information   [ Submit ]

[ Back to Entity Search ]

To contact a Delaware Online Agent click here.

---

site map | about this site | contact us | translate | delaware.gov

# EXHIBIT F



KELLY G. WATSON [1]
MICHAEL D. ROUNDS [1]
MATTHEW D. FRANCIS [2]

GLORIA M. HOWRYLA [1]
JAMIE L. WINTER [1]
BRENT H. HARSH [3]
MATTHEW A. SARNOSKI [1]
JASON C. FOULGER
ARTHUR A. ZORIO [1]
DANIELLE C. MILLER
CASSANDRA P. JOSEPH [4]
COLT B. DODRILL

OF COUNSEL-
SIERRA PATENT GROUP

[1] Also licensed in California
[2] Also licensed in Utah
[3] Also licensed in Oregon
[4] Only licensed in California

5371 Kietzke Lane
Reno, Nevada 89511
(775) 324-4100
Fax (775) 333-8171
e-mail: reno@watsonrounds.com

The Atrium Building
333 North Rancho Drive
Suite 800
Las Vegas, Nevada 89106
(702) 636-4902
Fax (702) 636-4904

www.watsonrounds.com

Reply to:   Reno

January 3, 2006

**VIA FACSIMILE**

Mark R. Fox
Fraser Trebilcock Davis & Dunlap
1000 Michigan National Tower
Lansing, MI 48933

Re: Stuart Entertainment subpoena

Dear Mark:

By now, I am sure that you have received a copy of our revised December 29, 2005 subpoena to Stuart Entertainment. The previous subpoena inadvertently had the District of Nevada, as opposed to the District of Delaware, in the caption. As I explained to you on the phone on December 28, 2005, your comment concerning service on a foreign corporation is inaccurate because Stuart Entertainment is a Delaware corporation, and service was properly made on its designated agent in the state of Delaware. Obviously, a Delaware corporation has, at a minimum, control over the production of records from a Canadian office, if that is where the responsive records are located.

The rest of your letter is lawyer chatter (particularly as to witness fees for a production of documents), and a response is not required.

Sincerely yours,

Michael D. Rounds
Watson Rounds
A Professional Corporation

# EXHIBIT G



WATSON
**WR**
ROUNDS

KELLY G. WATSON [1]
MICHAEL D. ROUNDS [1]
MATTHEW D. FRANCIS [2]

GLORIA M. HOWRYLA [1]
JAMIE L. WINTER [1]
BRENT H. HARSH [3]
MATTHEW A. SARNOSKI [1]
JASON C. FOULGER
ARTHUR A. ZORIO [1]
DANIELLE C. MILLER
CASSANDRA P. JOSEPH [4]
COLT B. DODRILL

OF COUNSEL-
SIERRA PATENT GROUP

[1] Also licensed in California
[2] Also licensed in Utah
[3] Also licensed in Oregon
[4] Only licensed in California

5371 Kietzke Lane
Reno, Nevada 89511
(775) 324-4100
Fax (775) 333-8171
e-mail: reno@watsonrounds.com

The Atrium Building
333 North Rancho Drive
Suite 800
Las Vegas, Nevada 89106
(702) 636-4902
Fax (702) 636-4904

www.watsonrounds.com

Reply to:   Reno

January 4, 2006

**VIA FACSIMILE**

Gregory E. Karpenko
Fredrikson & Byron
200 South Sixth Street, Suite 4000
Minneapolis, Minnesota 55402-1425

      Re:   BK Entertainment subpoena

Dear Mr. Karpenko:

Thank you for your letter of December 30, 2005, that emulates the letter of Mr. Fox dated December 28, 2005. I have attached a copy of my January 3, 2006 letter to Mr. Fox that addresses your alleged concerns. In short, we served a new subpoena on December 29, 2005 that is issued from the District of Delaware, as opposed to the District of Nevada, and therefore corrects this inadvertent and minor error. As I explained to Mr. Fox, the objection as to BK Entertainment (formerly known as Stuart Entertainment) being an alleged witness of a foreign country is without merit. BK Entertainment is a Delaware corporation, and the subpoena was properly served on its agent for service of process. Any responsive documents that exist in Ontario, Canada are within the control of BK Entertainment and must be produced in Delaware, although we will work with you on the location if that is truly an issue.

Please call me to discuss this issue at your soonest convenience. If BK Entertainment chooses to maintain its objections, FortuNet will file an immediate Motion to Compel and ask for its attorney's fees and costs. Thank you for your anticipated cooperation.

Sincerely yours,

Michael D. Rounds
WATSON ROUNDS
A Professional Corporation

cc: Mark Fox



KELLY G. WATSON [1]
MICHAEL D. ROUNDS [1]
MATTHEW D. FRANCIS [2]

GLORIA M. HOWRYLA [1]
JAMIE L. WINTER [1]
BRENT H. HARSH [3]
MATTHEW A. SARNOSKI [1]
JASON C. FOULGER
ARTHUR A. ZORIO [1]
DANIELLE C. MILLER
CASSANDRA P. JOSEPH [4]
COLT B. DODRILL

OF COUNSEL-
SIERRA PATENT GROUP

[1] Also licensed in California
[2] Also licensed in Utah
[3] Also licensed in Oregon
[4] Only licensed in California

5371 Kietzke Lane
Reno, Nevada 89511
(775) 324-4100
Fax (775) 333-8171
e-mail: reno@watsonrounds.com

The Atrium Building
333 North Rancho Drive
Suite 800
Las Vegas, Nevada 89106
(702) 636-4902
Fax (702) 636-4904

www.watsonrounds.com

Reply to:   Reno

January 3, 2006

**VIA FACSIMILE**

Mark R. Fox
Fraser Trebilcock Davis & Dunlap
1000 Michigan National Tower
Lansing, MI 48933

Re:  Stuart Entertainment subpoena

Dear Mark:

By now, I am sure that you have received a copy of our revised December 29, 2005 subpoena to Stuart Entertainment.  The previous subpoena inadvertently had the District of Nevada, as opposed to the District of Delaware, in the caption.  As I explained to you on the phone on December 28, 2005, your comment concerning service on a foreign corporation is inaccurate because Stuart Entertainment is a Delaware corporation, and service was properly made on its designated agent in the state of Delaware.  Obviously, a Delaware corporation has, at a minimum, control over the production of records from a Canadian office, if that is where the responsive records are located.

The rest of your letter is lawyer chatter (particularly as to witness fees for a production of documents), and a response is not required.

Sincerely yours,

Michael D. Rounds
Watson Rounds
A Professional Corporation

# EXHIBIT H

**Michael Rounds**

```
-----Original Message-----
From: "Mark Fox" <MFox@fraserlawfirm.com>
Date: Sat, 07 Jan 2006 16:38:10
To:<mrounds@vzw.blackberry.net>
Subject: Re: Subpoena to BK
```

Mike:

I am right on this issue and it's unfair and improper to make BK think your subpoena is valid when it isn't, and to then threaten it with a motion to compel and sanctions -- something you would never file since your subpoena is not worth the paper its written on. I needed your response by Monday because the return date on your purported subpoena is Wednesday.

Melange does have standing to move to quash a subpoena that is issued in violation of law. I've prevoiusly provided you case law for that point. Raising objections to what could be considered an "abuse of process" is not intefering; it is me doing my job as lawyer and making sure you follow the law. (In Michigam, abuse of process is an act in the use of process which is improper in the regular prosecution of the proceeding. I assume it's the same in Delaware.)

I do not believe you are making a good faith effort to obtain relevant documents. First, you have now issued two completely subpoenas that are completely null and void. Second, I do not believe you are entitled to use this existing lawsuit alleging infringement by the MaxPak to fish around into my client's other business activities to see if you can drum up something else so as to save your client's failing case.

You can call my comments whatever you want. I wanted to make it absolutely clear and emphasize to you that your subpoena to BK is invalid and that you should do the right thing and promptly withdraw it.

Perhaps, in light of the Markman decision, Mike Snow's deposition testimony, and the expiration of the '787 in a few months, Yuri might want to spend his money on something more productive rather than pouring it down a sinkhole. I don't plan to lose this case, because there is simply no infringement and you simply cannot prove otherwise. Since he's in the gaming business, maybe he should be calculting his odds of winning this lawsuit. I'd put them at somewhere close to zero. However, Yuri reminds me of the story of a man who was asked after much litigation: "So, how did you make your small fortune?" The man responded: "From a large fortune."

Mark

```
>>> "Michael Rounds of Watson Rounds" <mrounds@vzw.blackberry.net>
>>> 01/07/06 04:04PM >>>
```
We'll look at this, but I won't be responding by Monday, as you know. You're doing everything possible to interfere with this subpoena, for which you probably do not have standing, and I am not impressed by this. Even if you're right, which I doubt, we're going to get the documents one way or another. I don't see how a Delaware corporation is a witness of a foreign country, and this is not "confusing" to me.

Please do not include hyperbole in your letters to me. It's meaningless. We're making a good faith effort to obtain relevant documents, nothing more, nothing less. Mike.

```
-----Original Message-----
From: "Mark Fox" <MFox@fraserlawfirm.com>
Date: Sat, 07 Jan 2006 14:52:43
To:<mrounds@vzw.blackberry.net>
Cc:<Mrounds@watsonrounds.com>, <Ttrevino@watsonrounds.com>
Subject: Subpoena to BK
```

Mike,

I have conducted additional research to confirm that my initial recollection of the law was correct, i.e., your new subpoena issued from the district court in Delaware is absolutely, undeniably, unequivocally, and completely invalid and unenforceable. You seem to be confused between the validity of service of process of a subpoena on a Delaware corporation and the validity of a subpoena itself on a witness located in a foreign country.

The Walsh Act, 28 U.S.C. 1783, governs the procedure for obtaining a subpoena for a U.S. witness located in a foreign county, and you have failed to comply with any of those requirements. Rule 45(b)(2) allows witnesses located in foreign countries to be subpoenaed only when allowed by a court pursuant to 28 U.S.C. 1783. However, a subpoena cannot be issued to a witness abroad unless the district court finds both that the subpoena is necessary in the interest of justice and that it is impossible to obtain the testimony or documents in any other manner. The validity of the Walsh Act has been upheld by the United States Supreme Court. See, e.g.,Blackmer v. United States, 284 U.S. 421 (1932).

If after a showing is necessity, the district court authorizes the issuance of a subpoena under Secton 1783, it must be served according to the methods provided in the Federal Rules of Civil Procedure, and the estimated travel expenses must be tendered to the witness at the time of service.

You simply have no argument, let alone a good faith argument, that your latest subpoena to BK is valid or enforceable. I'm confident that now that you have been advised of the law and your error, you would not knowingly maintain that your purported subpoena is valid or that BK is obligated to comply with it.

Therefore, please fax a letter to BK's lawyer, with a copy to me, by 12:00 noon, Monday, January 9, 2006, withdrawing your December 29, 20906 subpoena to BK.

Thank you for your anticipated cooperation in this matter.

Mark R. Fox
Fraser Trebilcock Davis & Dunlap, P.C.
1000 Michigan National Tower
124 West Allegan Street - Suite 1000
Lansing, MI 48933
(517) 482-5800 - telephone
(517) 482-0887 - facsimile


Sent from my Verizon Wireless BlackBerry


Sent from my Verizon Wireless BlackBerry

# EXHIBIT I

**Michael Rounds**

| | |
|---|---|
| **From:** | Mark Fox [MFox@fraserlawfirm.com] |
| **Sent:** | Monday, January 09, 2006 6:06 PM |
| **To:** | Tricia Trevino |
| **Cc:** | Michael Rounds |
| **Subject:** | Re: FortuNet v. Melange |

Mike,

Attached, please find the motion to quash your BK subpoena, brief in support, and pro hac vice motion we filed today in the U.S. District Court for the District of Delaware.  You are also being served via fax and mail.
Since you would not agree to withdraw your subpoena today, and I go back to a patent trial tomorrow, and the return date on the subpoena is Wed, we had no choice but to prepare and file it today.  I do not know if the Court will hold a hearing or simply decide this motion on the papers.

>>> "Tricia Trevino" <Ttrevino@watsonrounds.com> 01/09/06 18:09 PM >>>
Mr. Fox:

    Pursuant to your request, attached hereto is the Affidavit of Process Server for the BK Entertainment subpoena regarding the above matter.

    Please feel free to contact me with any questions.

Sincerely,

Tricia Trevino

Assistant to Michael D. Rounds

WATSON ROUNDS

5371 Kietzke Lane

Reno, NV  89511

Telephone: (775) 324-4100

Facsimile: (775) 333-8171

e-mail: ttrevino@watsonrounds.com

# EXHIBIT J

**Michael Rounds**

From:        Michael Rounds of Watson Rounds [mrounds@vzw.blackberry.net]
Sent:        Monday, January 09, 2006 6:31 PM
To:          Mark R. Fox
Subject:     Re: FortuNet v. Melange


Mark: As you know, I was not in a position to research your point over the weekend or
today.  You never asked for an extension on the subpoena, which I would have provided.  I
doiubt you've satisfied the meet and confer reuiremetns, but we'll see.  We'll of course
address the Motion with the Court.  I'll talk to you on Thuirsday.  Mike.
-----Original Message-----
From: "Mark Fox" <MFox@fraserlawfirm.com>
Date: Mon, 09 Jan 2006 21:06:03
To:<Ttrevino@watsonrounds.com>
Cc:<Mrounds@watsonrounds.com>
Subject: Re: FortuNet v. Melange

Mike,

Attached, please find the motion to quash your BK subpoena, brief in support, and pro hac
vice motion we filed today in the U.S. District Court for the District of Delaware.  You
are also being served via fax and mail.
Since you would not agree to withdraw your subpoena today, and I go back to a patent trial
tomorrow, and the return date on the subpoena is Wed, we had no choice but to prepare and
file it today.  I do not know if the Court will hold a hearing or simply decide this
motion on the papers.

>>> "Tricia Trevino" <Ttrevino@watsonrounds.com> 01/09/06 18:09 PM >>>
Mr. Fox:

    Pursuant to your request, attached hereto is the Affidavit of Process Server for the
BK Entertainment subpoena regarding the above matter.

    Please feel free to contact me with any questions.

Sincerely,


Tricia Trevino

Assistant to Michael D. Rounds

WATSON ROUNDS

5371 Kietzke Lane

Reno, NV  89511

Telephone: (775) 324-4100

Facsimile: (775) 333-8171

e-mail: ttrevino@watsonrounds.com



Sent from my Verizon Wireless BlackBerry

# EXHIBIT K



January 10, 2006

Michael Rounds
Watson Rounds
5371 Kietzke Lane
Reno, NV  89511

Re:    BK Entertainment Subpoena

Dear Mr. Rounds:

We have received a copy of the Motion to Quash Subpoena Duces Tecum filed by Melange
Computer Services, Inc.  Based on the Motion to Quash, BK Entertainment, Inc. will respond, as
appropriate, after the Court rules on the Motion.

Very truly yours,

Gregory E. Karpenko

**Direct Dial:**  612.492.7064
**Email:**  gkarpenko@fredlaw.com

GEK\kk\#3218776 --

cc:     Mark Fox (via U.S. mail)

Attorneys & Advisors  /  Fredrikson & Byron, P.A.
main  612.492.7000  /  200 South Sixth Street, Suite 4000
fax  612.492.7077  /  Minneapolis, Minnesota
www.fredlaw.com  /  55402-1425

MEMBER OF THE WORLD SERVICES GROUP  /  OFFICES
A Worldwide Network of Professional Service Providers  /  Minneapolis, London, & Monterrey, Mexico